# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 22-0610V**
UNPUBLISHED

CLAUDETTE HULSEY,

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

Chief Special Master Corcoran

Filed: August 11, 2026

*Amy A. Senerth, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Mallori Brown Openchowski, U.S. Department of Justice, Washington, DC, for Respondent.*

**RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES**[1]

On June 3, 2022, Claudette Hulsey filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine administered on October 22, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons set forth below, I find that Petitioner is entitled to compensation.

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I. Relevant Procedural History

Petitioner filed a Motion for a Ruling on the Record and damages on July 7, 2025. Brief in Support of a Ruling on the Record ("Pet. Br."), as well as updated unreimbursed expenses and an affidavit. ECF No. 22-24; Ex. 9-11. On August 14, 2025, Respondent filed a Response. Respondent's Response to Petitioner's Brief on Entitlement and Damages ("Resp."), ECF No. 26. Petitioner did not file a reply. The matter is ripe for resolution.

## II. Relevant Factual History

On October 22, 2020, Petitioner received a flu vaccine in her left shoulder. Ex. 1 at 2. Prior to vaccination, Petitioner had no history of left shoulder injuries. Ex. 2.

On December 30, 2020, Petitioner saw Dr. Abraham Areephanthu with complaints of "left arm pain that started about 7-8 weeks ago that started right after flu shot". Ex. 2 at 8. Specifically, Petitioner reported left shoulder pain that she described as "very painful", "dull", worsening, constant; intermittent; and present for [more then] 1 month. *Id.* at 10. Dr. Areephanthu prescribed diclofenac and referred Petitioner for an MRI of her left shoulder. *Id*. at 11. On January 8, 2021, Petitioner underwent an MRI which revealed moderate acromioclavicular degenerative joint disease, mild supraspinatus tendinopathy, and mildly increased quantity of glenohumeral joint fluid. *Id.* at 42.

On January 18, 2021, Petitioner had an appointment with McLeod Orthopedics for complaints of persistent left shoulder pain "since October after receiving the flu vaccine." Ex. 3 at 16. At that time, Petitioner rated her pain as 7/10. *Id.* An examination revealed passive external rotation to 70 degrees with pain; positive impingement maneuvers; passive abduction to 80 degrees with pain; and pain that precludes reproducible supraspinatus isolation testing. *Id.* at 17. Physician's Assistant ("PA") Christopher Huiet diagnosed her with adhesive capsulitis and tendinosis of the rotator cuff. PA Huiet also administered a cortisone injection into Petitioner's left shoulder, referred her to occupational therapy ("OT"), and recommended she follow up in 6 weeks. *Id.* at 18; Ex. 4 at 10. Petitioner attended six OT sessions between February 9 and 26, 2021. Ex. 4 at 20-45; Ex. 5 at 169.

On March 1, 2021, Petitioner returned to McLeod Orthopedics complaining of persistent left shoulder pain and stiffness. Ex. 3, at 13. PA Huiet diagnosed her with adhesive capsulitis, administered a second steroid injection, and referred her for aggressive OT. *Id*. at 14-15. On April 12, 2021, Petitioner returned, continuing to complain

of left shoulder pain, rating her pain as 6/10. *Id.* at 10-11. PA Huiet diagnosed her with adhesive capsulitis and referred her to an orthopedic surgeon. *Id*. at 11.

On May 3, 2021, Petitioner returned to McLeod Physician Associates with complaints of left shoulder pain that she rated as 9/10. Ex. 3 at 6. Petitioner stated that she “had a flu shot on 10/22/2020. She did [have] a lot of pain in the shoulder after that flu shot and noticed increasing stiffness.” *Id.* Dr. Zachary J. DiPaolo diagnosed her with adhesive capsulitis and recommended a left shoulder arthroscopic capsular release with manipulation under anesthesia. *Id*. at 7-8. On May 11, 2021, Petitioner underwent an arthroscopic capsular release, lysis of adhesions, subacromial decompression with acromioplasty, and manipulation under anesthesia. *Id.* at 22-24.

On May 12, 2021, Petitioner went to McLeod Outpatient Rehabilitation and Sports Medicine Facility for post-operative PT. Ex. 5 at 48. Physical Therapist Shauna Krawlec recommended treatment three times per week for six weeks. *Id.* at 114-121. Petitioner continued treatment for 14 sessions through July 14, 2021. *Id*. at 50-55. During Petitioner’s PT visit on May 27, 2021, she rated her pain “0/10.” *Id.* at 82. At her last session she reportedly still had some pain when lowering her shoulder after lifting (rating it as 4/10), but also rated her pain as 0/10 at rest. *Id.* at 51.

Petitioner returned to McLeod Physician Associates for a two week post operative appointment on May 26, 2021. Ex. 8 at 10. She rated her pain as 3/10 and reported that she was doing well in PT. *Id*.

On July 19, 2021, Petitioner returned to McLeod Physician Associates following completion of PT. Ex. 8 at 8. She rated her pain as 0/10 and was described as “doing quite excellent regards to pain and improving her range of motion.” *Id.* Dr. DiPaolo recommended she continue PT for at least another six weeks to regain full ROM. *Id*. at 8-9.

Petitioner returned to McLeod Physician Associates on August 30, 2021. Ex. 8 at 6. She was doing “excellent,” had “no pain” in her shoulder, and was “very pleased with her outcome.” However, her shoulder was noted as about 85% improved. *Id.* Dr. DiPaolo transitioned her to a home exercise program. *Id*. at 6-7.

## III. Legal Standards for SIRVA

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must preponderantly prove the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of

petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.*, NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

## IV. Factual Findings Regarding a Table SIRVA

Review of the entire record reveals that a preponderance of the evidence supports the conclusion that Petitioner has satisfied the QAI requirements for a Table SIRVA.

### A. Petitioner Had No Prior Left Shoulder Condition or Injury that would Explain her Symptoms

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after. 42 C.F.R. § 100.3(c)(10)(i). Respondent does not dispute that Petitioner meets this criterion. I find that she has demonstrated a lack of history of pain, inflammation, or dysfunction of her left shoulder that would explain her symptoms.

### B. Onset of Petitioner's Injury Occurred within Forty-Eight Hours of her Vaccination

The record preponderantly establishes onset of injury close-in-time to the October 22, 2020 vaccination. Petitioner first reported shoulder pain on December 30, 2020, noting "left arm pain that started about 7-8 weeks ago that started right after flu shot". Ex.

2 at 8. Further, she linked her shoulder pain to this same vaccination event on multiple occasions. *See,* e.g., Ex. 3 at 16 (record from January 18, 2021, noting persistent left shoulder pain "since October after receiving the flu vaccine"); *id.* at 6 (record from May 3, 2021, reporting left shoulder pain after a flu vaccine on October 22, 2020).

Respondent argues that Petitioner sought treatment more than two months after her vaccination, and reported a seven to eight-week history of pain, which indicates that her pain began in early November of 2020. Resp. at 5-6. But Program petitioners are not required to marshal records setting forth with chronographic specificity the precise day and hour that their onset manifested. As noted above, Petitioner repeatedly linked her shoulder pain to the October 22, 2020, vaccination.

When the record is viewed in its entirety there is ample evidence to find proper onset began close to the vaccination date. Accordingly, there is preponderant evidence that establishes the onset of Petitioner's left shoulder pain more likely than not occurred within 48-hours of vaccination.

### C. Petitioner's Pain was Limited to her Left Shoulder

Petitioner's pain was limited to her left shoulder. Respondent does not contest this aspect of Petitioner's claim, and there is nothing in the records to suggest otherwise.

### D. There is No Evidence of Another Condition or Abnormality

The last criteria for a Table SIRVA state that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent does not contest this aspect of Petitioner's claim and there is nothing in the records to suggest otherwise.

### E. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly on October 22, 2020, in the United States. Ex. 1 at 2; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United

States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Ex. 6 at 2; Section 11(c)(1)(E) (lack of prior civil award).

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## V. Damages

### A. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my

predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

## VI. Prior SIRVA Compensation Within SPU[4]

### B. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, 4,545 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,397), with the remaining 148 cases dismissed. 2,506 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[5] In only 270 of these cases, however, was the amount of damages determined by a special master in a

[4] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[5] The remaining 1,891 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

reasoned decision.[6] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[7]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

| | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[8] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *270* | *2,206* | *30* | *1,891* |
| **Lowest** | $30,000.00 | $5,000.00 | $45,000.00 | $1,500.00 |
| **1st Quartile** | $67,305.16 | $60,000.00 | $90,000.00 | $32,500.00 |
| **Median** | **$89,500.00** | **$80,000.00** | **$122,866.42** | **$50,000.00** |
| **3rd Quartile** | $125,000.00 | $107,987.07 | $162,000.60 | $75,000.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### C. Pain and Suffering Awards in Reasoned Decisions

In the 270 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $30,000.00 to $215,000.00, with $87,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from

[6] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,206 cases) or stipulation (30 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[7] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[8] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

$250.00 to $1,500.00.[9] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[10]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VII. The Parties' Arguments

Petitioner is seeking $140,000.00 for pain and suffering, and $7,829.37 for medical expenses. Pet. Br. at 14. She highlights that she suffered significant shoulder pain for over ten months, had physical and occupational therapy, two steroid injections, and

[9] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs*., No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[10] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A)); *see Youngblood v. Sec'y of Health & Hum. Servs*., 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the application of the statutory cap before any projected pain and suffering award is reduced to net present value).

ultimately surgery. *Id.* at 12. Petitioner cites to *Hathcock v. Sec'y of Health & Hum. Servs.*, No. 20-0005V, 2025 WL 512186, at *14 (Fed. Cl. Jan. 14, 2025) (awarding $140,000.00) as a comparable case.

Respondent did not set forth a specific amount for pain and suffering, but proposed an award between $70,000.00 and $90,000.00. Resp. at 12-13. He notes that Petitioner delayed in seeking treatment for over two months, treated for only eight months, had other underlying degenerative sources of shoulder pain, and ultimately had an excellent prognosis. Resp. at 10-11. Respondent cites to three cases awarding between $60,000 and $97,500 as comparable cases. *Klausen v. Sec'y of Health & Hum. Servs.*, No. 19-1977V, 2023 WL 2368823, at *1 (Fed. Cl. Mar. 6, 2023) (awarding $60,000.00 in past pain and suffering); *Winkle v. Sec'y of Health & Hum. Servs.*, No. 20-0485V, 2022 WL 221643 (Fed. Cl. Jan. 11, 2022) (awarding $68,500.00 in past pain and suffering); *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093, at *7 Fed. Cl. May 21, 2021) (awarding $97,500.00 in past pain and suffering).

Respondent also stated that although "assessing damages is premature, [he] does not contest" the $7,829.37 in unreimbursed medical expenses requested by Petitioner. Resp. at 2 n.1.

### VIII. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

The record establishes that Ms. Hulsey suffered a SIRVA for approximately ten months. She initially delayed approximately two months before seeking treatment. Ex. 2 at 8. When Petitioner did seek care, she reported significant pain ranging from six to nine out of ten from December of 2020 through May of 2021. *Id.,* Ex. 3 at 6. She ultimately underwent surgery on May 11, 2021, and quickly saw a reduction of pain to three out of ten by May 26, 2021. Ex. 3 at 22-24; Ex. 5 at 51. Petitioner continued to improve, and by August of 2021 she reported no pain and her shoulder was "about 85% improved." Ex. 8 at 6.

Overall, Petitioner's treatment occurred over ten months, consisted of physical therapy, occupational therapy, two cortisone injections, an MRI, and surgery. Her pain was described as 6-9/10 initially, with swift improvement after her surgery.

I do not find that an award of $140,000.00 would be appropriate. Petitioner's selected case, *Hathcock*, involved a more severe course of treatment. In *Hathcock*, the petitioner reported her injury within 36 days, described a very high level of pain, and had significant PT treatments. Ms. Hulsey delayed initial treatment for over two months and reported slightly less pain.

However, Respondent's cases are also not all that on point. As Respondent correctly notes, *Shelton* is an outlier from the general six-figure benchmark for pain and suffering awards in SIRVA cases involving surgery. Resp. at 13 n.6 (referencing *Shelton v. Sec'y of Health & Hum. Servs.*, No. 19-279V, 2021 WL 2550093, at *7 Fed. Cl. May 21, 2021)). Further, neither the *Klausen* nor *Winkle* petitioner underwent surgery, and both delayed more before seeking treatment. *Klausen*, 2023 WL 2368823, at *6; *Winkle*, 2022 WL 221643 at *6, *8. Respondent's proposed award falls well outside the norm for a SIRVA case of this caliber.

Thus, having reviewed the record and briefing, I find that none of the parties' cases are particularly analogous, and an appropriate award should be somewhere between the preferred figures. A recent case involving an award of $115,000.00 for pain and suffering is a useful comparator for a moderate SIRVA involving surgery. *McDonald v. Sec'y of Health & Hum. Servs.*, No. 22-0215V, 2025 WL 778359 (Fed. Cl. Spec. Mstr. Feb. 5, 2025). The *McDonald*, petitioner reported pain within two weeks post-vaccination to her primary care provider, and then went to an orthopedist. She received one steroid injection and participated in eight PT sessions. The petitioner returned to the orthopedist two months later with an exacerbation of symptoms. She received another steroid injection. She then underwent arthroscopic surgery about seven months after vaccination. At her final post-op orthopedic appointment, the doctor noted improvement, but still some deficits. The petitioner completed PT sessions and had her final session approximately ten months after vaccination. She still had some limitations in range of motion but apparently did not seek further treatment.

Similarly, Ms. Hulsey treated for approximately ten months, had two steroid injections, underwent surgery approximately seven months post-vaccination, and had a course of physical therapy. At her final appointment, Petitioner was doing much better but was not back to baseline. There are some difference between two petitioners however, as Ms. Hulsey delayed longer in seeking treatment, but also had an additional cortisone

injection.

Balancing the severity of Petitioner's SIRVA injury, the course of treatment, and based on the record as a whole, I find that **$115,000.00** for actual pain and suffering is reasonable and appropriate in this case.

## Conclusion

**For all of the reasons discussed above, and based on consideration of the record as a whole, I find Petitioner is entitled to compensation. Further, I award Petitioner a lump sum payment of $122,829.37 (representing $115,000.00 for actual pain and suffering and $7,829.37 for unreimbursed medical expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.**

**This amount represents compensation for all items of damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.**[11]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[11] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by each filing (either jointly or separately) a notice renouncing their right to seek review.